## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KEVIN YOUNGER

                    Plaintiff,

        v.

TYRONE CROWDER, *et al.*

                    Defendants.

Civil No. RDB-16-3269

## PLAINTIFF'S COMBINED OPPOSITION
## TO DEFENDANT CROWDER, DUPREE AND SINGLETARY'S
## MOTIONS FOR SUMMARY JUDGMENT
## AND REQUEST FOR HEARING[1]

DAVID DANEMAN, #06976, CPF #8912180145
ALLEN E. HONICK, #19822, CPF #1612130266
**WHITEFORD, TAYLOR & PRESTON, L.L.P.**
Seven St. Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
(410) 347-8700
ddaneman@wtplaw.com
ahonick@wtplaw.com

December 2, 2019

        Counsel for Plaintiff Kevin Younger

---

[1] Younger recognizes that Local Rule 105.3 limits the length of his opposition to 35 pages. However, rather than separately responding to each pending motion for summary judgment just for the purpose of page limit compliance, Younger instead opts to combine his oppositions herein.

RELEVANT FACTS AND BRIEF INTRODUCTION.................................................................. 2

STANDARD OF DETERMINATION............................................................................... 5

ARGUMENT................................................................................................................. 6

I.    STATE CASE DOES NOT PRECLUDE THIS ACTION ............................................. 7

II.   DEFENDANTS ARE ESTOPPED FROM DISPUTING YOUNGER'S PRETRIAL STATUS AT THE TIME
OF THIS ATTACK ........................................................................................................ 7

III.  CROWDER IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY COUNT BECAUSE THERE
IS OVERWHELMING EVIDENCE SUPPORTING LIABILITY ............................................. 10
      a.   *Crowder Knew or Should Have Known That his Subordinate Officers Were Engaged in
      Constitutionally Offensive Conduct That Threatened Prisoners at MRDCC*........................ 12
           Felicia Hinton.............................................................................................. 12
           Suzanne Fisher............................................................................................ 16
           Raymond Peré............................................................................................. 20
           Richard Hanna ........................................................................................... 23
      b.   *Crowder's Inadequate Response to His Actual and Constructive Knowledge of
      Pervasive Constitutional Violations by his Subordinates Shows His Deliberate Indifference
      or Tacit Authorization of the Offensive Conduct*.............................................................. 28
      c.   *Crowder Did Not Respond Reasonably to the Ganiyu Incident* ..................................... 31
      d.   *Binding Precedent Mandates Denial of Defendants' Motions*.................................... 36
      e.   *Recent Decision Further Supports Denying Defendants' Motions*.............................. 38
      f.   *IIU Reports are Admissible Public Records* ................................................................ 40

IV.   CROWDER IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR COUNT I (§ 1983)............... 42

V.    YOUNGER PROPERLY EXHAUSTED HIS ADMINISTRATIVE REMEDIES BECAUSE IIU'S
INVOLVEMENT RENDERED THOSE REMEDIES UNAVAILABLE ...................................... 44
      a.   *IIU Investigation Rendered Administrative Remedies Unavailable to Younger*............ 45

CONCLUSION.............................................................................................................. 49

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KEVIN YOUNGER<br><br>               Plaintiff,<br><br>        v.<br><br>TYRONE CROWDER, *et al.*<br>               Defendants. | Civil No. RDB-16-3269 |

## PLAINTIFF'S COMBINED OPPOSITION
## TO DEFENDANT CROWDER, DUPREE AND SINGLETARY'S
## MOTIONS FOR SUMMARY JUDGMENT
## AND REQUEST FOR HEARING[1]

Plaintiff Kevin Younger, through his undersigned counsel, hereby opposes Defendant Crowder, Dupree, and Singletary's Motions for Summary Judgment, and states:[2]

## RELEVANT FACTS AND BRIEF INTRODUCTION

Younger adopts and incorporates the statement of facts on pages 3 to 11 of the Court's recent Memorandum Opinion (ECF 188), except as modified or supplemented herein. Younger also asks the Court to take judicial notice of his contemporaneous action against the State of Maryland, *Younger v. Maryland*, Case No. 24-C-17-004752 (Balt. City Cir. Ct.), filed Sept. 21, 2017 (the "State Case").

To be clear, Younger alleges that Crowder, Singletary, and Dupree knew or should have known that their subordinates were engaged in widespread prisoner abuse at MRDCC,[3] and were

---

[1] Younger recognizes that Local Rule 105.3 limits the length of his opposition to 35 pages. However, rather than separately responding to each pending motion for summary judgment just for the purpose of page limit compliance, Younger instead opts to combine his oppositions herein.

[2] Younger adopts and incorporates his previous Oppositions (ECF Nos. 67, 166), together with Dupree and Singletary's initial motion to dismiss (ECF 60), as if fully set forth herein.

[3] The Maryland Reception, Diagnostic and Classification Center.

either deliberately indifferent to, or tacitly authorized that conduct, which ultimately caused Younger's harm. Crowder also permitted Younger to be falsely accused and punished for his alleged involvement in the Ganiyu incident, when Crowder had actual knowledge that these accusations were fabricated. Younger further alleges that Dupree assisted his vigilante subordinate officers in violating prisoners' rights well before the attack by providing those officers with the names and cell locations of prisoners against whom Dupree, or other supervisors, sought retribution. Moreover, Dupree is alleged to have specifically ordered the subject attack on the morning of September 30, 2013.

Crowder's failures are not confined to the two days between the Ganiyu incident on September 29th, and the commencement of Internal Investigative Unit's ("IIU") investigation of the subject attack on October 1, 2013.[4] Even if they were, Crowder's repeated failures within that short time, by themselves, violated Younger's constitutional rights. Indeed, Crowder's repeated failures to intervene, despite his actual knowledge of constitutional violations by his subordinates, predate the attack by many years. And after the attack, Crowder's failures to set the record straight, with actual knowledge that Younger was falsely accused in the Ganiyu incident, caused Younger to be wrongfully administratively convicted and detained in solitary confinement for four months, and to face formal criminal charges of allegedly assaulting an officer.

To prove his allegations, Younger will rely on the testimony of several current and former state employees, and on the findings and conclusions of IIU as detailed in official investigative reports. Defendants are well aware of the mountain of evidence supporting

---

[4] IIU is now known as the Internal Investigative Division, or IID. For the purposes of this memorandum, the two acronyms mean the same thing.

Younger's claims, but argue, on pages 11 to 21 of the Crowder motion, that this evidence is not admissible.

In their motions, Defendants ignore, or conveniently omit, the testimony of Felicia Hinton, former MRDCC warden and assistant commissioner for the Maryland Department of Public Safety and Correctional Services ("DPSCS"). Hinton will testify about MRDCC's ruthless and uncontrolled environment, Crowder's actual knowledge of Green and Ramsey's predilection for violence, and Crowder's multiple and repeated failures to intervene, despite Hinton specifically ordering Crowder to do so. Defendants have denied these claims, although not in their pending motions.

Moreover, IIU conducted three lengthy and comprehensive investigations after the attack and produced formal factual findings and conclusions, pursuant to their statutory duties. Each of these reports is the epitome of a public record, under FRE 803(8)(C), as more fully explained below. Moreover, the individual detectives who authored these reports will testify at trial. Defendants ignore the IIU reports in their motions, like they do with Hinton's damning testimony, albeit for different reasons.

Defendants apparently forget that they previously attached one of these three IIU investigative reports (IIU No. 13-35-01334) to their initial motions to dismiss/summary judgment in 2017. *See* ECF Nos. 46-2, 60. The other two investigative reports, IIU Nos. 13-35-01347 and 13-35-01359, which are attached hereto as **EXHIBITS 1 AND 2** respectively, conclude in no uncertain terms that the subject attack could have been avoided had Crowder and his underlings responded to Green, Ramsey, and Hanna's unconstitutional conduct at MRDCC in the years prior to the attack. Younger will elicit trial testimony from the detectives who authored these reports to authenticate the documents themselves and to corroborate their findings and

conclusions.[5] Moreover, Younger's prison administration expert reviewed and relied on these reports in forming his opinions and conclusions and will testify at trial.

Although the Defendants argue, on pages 16 to 21 of the Crowder motion, that Younger cannot prove their knowledge of constitutionally offensive behavior by their subordinates, the Defendants are actually asking the Court to supplant the jury's function as factfinder and determine that "Crowder acted reasonably" based on the information that he purports to have known prior to the attack. Crowder Mot. at 21. As the record clearly shows, and as more fully explained below, any reasonable juror considering these facts could conclude that each Defendant acted with deliberate indifference to Younger's constitutional rights.

## STANDARD OF DETERMINATION

Rule 56(a) provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Danser v. Stansberry*, 772 F.3d 340, 345 (4th Cir. 2014) (noting that facts at the summary judgment stage must be viewed "in the light most favorable to the nonmoving party"). In ruling on a summary judgment motion, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A motion for summary judgment should not be granted unless the movant can prove, "from the totality of the evidence, including pleadings, depositions, answers to interrogatories, and affidavits, the court believes no genuine issue of material fact exists for trial and the moving

---

[5] Younger has tried several times to reach an agreement with the Defendants concerning the authenticity of these reports, but Defendants have not responded to those repeated requests as of the date of this filing. Notably, counsel for the Defendants produced these reports to Younger, but now apparently challenges the authenticity of these documents.

party is entitled to judgment as a matter of law." *Whiteman v. Chesapeake Appalachia, LLC,* 729 F.3d 381, 385 (4th Cir. 2013). In opposing a summary judgment motion, the nonmoving party is entitled to have the "credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979).

## ARGUMENT

Supervisory liability under § 1983 requires evidence that: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* at 25 (quoting *Baynard v. Malone,* 268 F.3d 228, 235 (4th Cir. 2001)).[6] Regarding supervisory liability determinations, the Fourth Circuit long ago clarified that "this issue is ordinarily one of fact, not law." *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994) (emphasis supplied).

Here, there is overwhelming evidence that each Defendant had actual and constructive notice that Green and Ramsey, among many others, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to prisoners like Mr. Younger. Indeed, that risk materialized on many occasions before the subject attack. And the Defendants knew about these violations, but failed to intervene. In some cases, they even facilitated the violations,

---

[6] Crowder incorrectly states the first prong of this standard on page 15 of his motion by arguing that constructive knowledge of his subordinates' unconstitutional conduct "cannot save" Younger's § 1983 claim from summary judgment.

or covered them up after the fact. Even if the Defendants never personally laid hands on prisoners, either prior to, or during the subject attack, that is irrelevant when evaluating their liability under § 1983. Stated somewhat differently, the Defendants' "supervisory indifference or tacit authorization of [their] subordinates' misconduct" was "a causative factor in the constitutional injuries the[ir subordinates] inflict[ed] on those committed to their care;" here, on Mr. Younger. *Baynard*, 268 F.3d at 235. The Court can infer both knowledge and deliberate indifference from subordinates' widespread misconduct. *See Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014) (citation omitted).

### I.   STATE CASE DOES NOT PRECLUDE THIS ACTION[7]

This Court recently held that:   1) "*res judicata* does not bar Younger's claims"; 2) Crowder is not immune from Younger's state-law claims, rejecting that argument as "meritless"; and 3) "judicial estoppel does not foreclose Younger from alleging that Crowder, Dupree, and Singletary acted with gross negligence." Mem. Op., ECF 188, at 13, 19, 21, 22. In the spirit of pleading economy, Younger will not reiterate the arguments raised in his opposition to Defendants' motions to dismiss (ECF 166), but incorporates by reference those arguments herein.

### II.   DEFENDANTS ARE ESTOPPED FROM DISPUTING YOUNGER'S PRETRIAL STATUS AT THE TIME OF THIS ATTACK[8]

Several facts prevent the Defendants from disputing Younger's pretrial detainee status at the time of the attack. First, Crowder admitted Younger's pretrial status during his State Case testimony:

---

[7] Singletary joins in Crowder's preclusion arguments, ECF 187-1, at 3, and Dupree relies on his previously filed— and now denied—briefs in support of his motion to dismiss. ECF 186-1, at 3. Accordingly, "Defendants" in this Section refers to Crowder and Singletary, as Dupree makes no new preclusion arguments.

[8] Crowder briefs this issue for all moving Defendants, on pages 2, and 15-16 of his motion.

> Counsel:    And I think we all agree, it's actually been stipulated to that Mr. Younger was there at MRDCC only briefly as part of a pretrial process, right?
>
> Crowder:    Yes, sir.

Crowder Test. (State Case), attached as **EXHIBIT 3**, at 266:1-4.

Second, the Defendants in this action are represented by the same counsel that represented the State of Maryland in the State Case, who are also pursuing the appeal. And counsel has represented both sets of defendants since September 2016. During those agency relationships, counsel in the State Case represented to the Circuit Court for Baltimore City, both in written pleadings and in stipulated facts, that Younger was "a pretrial detainee" at the time of this attack. *See* ECF Nos. 166-1 (OAG motion *in limine*, State Case), 166-3 (OAG Jt. Stmt. of Facts, State Case). Counsel represented the moving Defendants when it made these representations to the prior tribunal in a motion and in a stipulated joint statement of facts that the circuit court accepted and read to the jury as part of its instructions. *See* ECF Nos. 166-1, 166-2 (State Case docket summary), 166-3.

Conflicts of interest aside, Maryland Rule 19-301.10 makes clear that "a firm of attorneys is essentially one attorney for purposes of the rules." And Rule 19-303.3 prohibits attorneys from engaging in conduct "that undermines the integrity of the adjudicative process." *Id.* at cmt. 2. That Rule further provides that an attorney's assertion "in a statement in open court, may properly be made only when the attorney knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry." *Id.* at cmt. 3.

Here, Defendants' counsel cannot have it both ways. Either individual counsel in the State Case, or individual counsel for these Defendants, is being less than candid. To find

otherwise would endorse counsel taking diametrically opposed factual positions—or speaking out of both sides of its mouth—in substantially related matters, and about the same specific facts.

Third, Crowder offers the Declaration of Judith Hemler, Deputy Director of the DPSCS Commitment Office, to argue that Younger was a convicted prisoner at the time of the attack. *See* ECF 185-7. However, Crowder never identified Ms. Hemler in his initial Rule 26(a)(1) disclosures, the two supplemental disclosures thereto, or in his Rule 26(a)(2) disclosure.[9] In fact, Crowder's mandatory disclosures identify a "representative and/or custodian of records" for DPSCS, but that individual is only expected to testify about the Defendants' employment records, and the authenticity of DPSCS records. *See* Crowder Rule 26(a) disclosures and supplements, attached as **EXHIBIT 4**. Crowder only identified Ms. Hemler on November 18, 2019, five weeks past the discovery deadline and less than sixty days before trial. Moreover, Crowder attaches thirty documents to Ms. Hemler's Declaration, none of which have ever been produced, either in discovery, or in response to Younger's subpoenas to the State of Maryland.[10]

Ms. Hemler's offered testimony is highly specialized. As the Advisory Committee Notes to FRE 702 make clear, "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Here, a cursory review of Hemler's exhibit makes clear that an untrained layperson cannot intelligently determine Younger's commitment history and status without enlightenment from an expert.

---

[9] Even if the Court finds that neither Crowder, nor his counsel, knew about Younger's pretrial status as a result of the State Case, Crowder had actual knowledge of same on September 30, 2019, when Younger filed his opposition to Defendants' motions to dismiss. *See* ECF 166. Crowder actually filed his last supplemental Rule 26 disclosure on October 15, 2019, more than two weeks after Younger's opposition, and that supplement did not identify Ms. Hemler.

[10] This is a page out of the playbook for counsel in the State Case, who offered an undisclosed witness who was not subject to voir dire, together with approximately 300 pages of never-before-produced documents on the seventh day of trial.

Younger would have to retain his own expert to evaluate and refute Hemler's assertions. In order to do so, Younger would have to depose Hemler. Not only is discovery closed and trial on the close horizon, but <u>Younger's commitment status should not be in dispute</u>. Younger relied on counsel for the Defendants' prior written representations, concessions, and stipulation on this precise point. The Circuit Court for Baltimore City relied on that position throughout the pendency of the State Case. If the Defendants, through their counsel, have their way, Younger and Judge Rubin will have relied on these representations to their detriment.

In sum, counsel for the Defendants continue to play fast and loose with the rules of this Court and with the ethics of their entangled attorney-client relationships. Younger should be able to rely on counsel's prior representations concerning his pretrial status, and the Defendants should be estopped from revisiting that matter. Even if Defendants are not estopped, their discovery violations preclude them from offering Hemler's Declaration at the eleventh hour.

### III.   CROWDER IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY COUNT BECAUSE THERE IS OVERWHELMING EVIDENCE SUPPORTING LIABILITY[11]

<u>At the time of the attack, Ramsey and Green had four pending criminal assault investigations—all between March and September of 2013</u>. *See* DPSCS IIU Prior Case Histories for Green and Ramsey, attached as **EXHIBIT 5**. Green had at least one prior excessive use of force sustained. *See id.* And Ramsey had been previously suspended for unauthorized use of force. *See* Fisher Stmt. to Det. Murray (Oct. 24, 2013), attached as **EXHIBIT 6**, at 25:5-10.

That Crowder—knowing what he knew or ought to have known—kept Green and Ramsey in circulation as supervisors and in regular contact with prisoners is, by itself, a § 1983 violation. Sadly, that decision permitted untold constitutional violations, including the brutal

---

[11] Singletary and Dupree only raise procedural arguments (exhaustion, *res judicata*, and judicial estoppel) in their respective summary judgment motions, and make no arguments regarding the sufficiency of evidence to support § 1983 supervisory liability against them.

attack on Mr. Younger.  Crowder's second and third in command, together with his immediate supervisor and the Commissioner of Corrections all admitted that Crowder ignored the obvious warning signs of Green and Ramsey's predilection to violence, and failed to protect the safety of the prisoners in his care, even after knowing that they had been assaulted by his staff.

But Crowder's culpability does not end with his acquiescence to Green and Ramsey's vigilante behavior.  Crowder personally (and solely) committed what may be the most indifferent act in this entire saga; namely, allowing Younger to be administratively charged with, and found guilty of, a crime he did not commit.  Which was followed by four months in solitary confinement, and life-altering criminal charges pending for over a year, until the prosecutors finally realized a terrible mistake had been made.

On the night of September 30, 2013, Younger lay in a cell by himself, bloody and broken, when the door suddenly opened.  Younger panicked, believing that someone had come back to kill him, and climbed under his bunk, wedging himself between the concrete floor and the metal bedframe and covering himself with his mattress.  Younger Test. (State Case), attached as **EXHIBIT 7**, at T-36:1-6.  Younger was shocked and surprised to discover that it was a captain and Crowder paying him a visit.  *Id.* at T-36:14-21.  Younger provided Crowder with details about the attack, including the names of his assailants, and the fact that he had come to Ganiyu's aid during that altercation.  *Id.* at T-37:3-23.  Crowder acknowledged the information and confirmed with Younger that the supervision knew that he had assisted Ganiyu.  *Id.*

Within one week, Younger was administratively charged and convicted of assaulting Ganiyu—all while at MRDCC and when Crowder was still the warden.  At his disciplinary hearing, Younger could not call witnesses, present evidence, or rely on investigative documents to show that he helped Ganiyu.

**a. Crowder Knew or Should Have Known That his Subordinate Officers Were Engaged in Constitutionally Offensive Conduct That Threatened Prisoners at MRDCC**

Crowder attempts to raise the burden of proof for supervisory liability on page 16 of his motion by requiring Younger to prove that Crowder "knew in advance that the three Assailants intended to attack Mr. Younger on September 30, 2013." Although proving supervisory liability is a demanding burden, clairvoyance is not part of that calculus. Rather, Crowder simply needs to have been aware of a risk of constitutional injury "to citizens <u>like</u> the plaintiff." *Shaw*, 13 F.3d at 799 (emphasis supplied). Nothing more is required.

Crowder's actual knowledge of widespread constitutional violations at MRDCC is staggering, and it dates back to his time as assistant warden under Felicia Hinton. That Crowder continues to ignore the facts demonstrating his actual knowledge—including deposition testimony elicited by his own counsel just a few short weeks ago—lends even more support to Younger's claims of Crowder's indifference during his tenure as warden of MRDCC. And Crowder's contradictory positions and revisionist narrative years later when he is finally being held accountable for his failures solidifies his indifference.

*Felicia Hinton*

Ms. Hinton worked in DPSCS for 32 years before retiring in 2016. Hinton Dep., attached as **EXHIBIT 8**, at 7:11-18. She began her career as a correctional officer and retired as an assistant commissioner. *Id.* at 7:19-21, 10:9. Hinton served as warden of MRDCC, with Crowder as her assistant warden, from 2006 to 2009, when Crowder became warden. *Id.* at 9:15-10:7, 17:8-11. Hinton "objected" to Crowder's promotion to warden because she "didn't feel like he had enough experience." *Id.* at 17:16-21.

Hinton clearly recalls Green's decline from an officer with "all the right stuff" to an "arrogant" guard with "relationship[s]" and "baby mama drama" with female shift members. *Id.* at 24:12, 26:14-19, 101:10-19. In fact, Hinton further recalls that "one or two" female correctional officers at MRDCC "had children by him," meaning Green, and these female officers worked on Green's shift. *Id.* at 166:17-167:7. Singletary and other supervisors "tried to make [Green] a god" because of his confidence and physical stature: "Nobody would put boundaries on this young man." *Id.* at 24:17-22.

As both warden and assistant commissioner, Hinton "saw a particular officer's name [Green] flagged as having engaged in excessive force" such that he required reassignment to a "shift where they will be less engaged with the inmate population." *Id.* at 20:5-15. Hinton specifically recalls two incidents with Green prior to 2013, where he "body slammed an inmate onto the floor" in one, and another where a prisoner "was handcuffed and [Green] swept his legs from underneath him." *Id.* at 24:1-5.

Green's rule-breaking became such an issue that Hinton intervened herself. She first had several "conversations" with Green's direct supervisors, including Singletary, "about more guidance and reigning him in." *Id.* at 25:5-10. Hinton remembers discussing with Crowder her concerns about Green prior to 2013. *Id.* at 133:8-12. In one of her final acts as warden of MRDCC, Hinton transferred Green to the overnight shift where he would have less prisoner contact. *Id.* at 25:16-21, 113:14-17. But Crowder transferred Green back to the dayshift "as soon as [Hinton] left MRDCC." *Id.* at 113:14-2.

Hinton recalls certain red flags in prisoner medical reports, like an injured prisoner reporting that "I fell out of my bunk." *Id.* at 131:22-133:1. And Hinton agrees that repeated instances of that statement in medical reports is "a problem." *Id.* at 133:1. Notably, Peré told

Det. Murray in October 2013 that before the attack, he saw "A lot of it. I fell off my bunk. I hit my head." Peré Stmt. to Det. Murray (Oct. 12, 2013), attached as **EXHIBIT 9**, at 12:10-20.

Hinton also recalls Crowder describing how he personally "beat up" prisoners in the past, both in Texas and at the old MCAC Supermax facility in Baltimore,[12] where Crowder briefly served as warden prior to arriving at MRDCC. Ex. 8 at 82:20-84:1. In fact, Crowder was investigated for the MCAC incident, "excessive force was founded," *id.* at 84:6-13,[13] and that case was referred to the Baltimore City State's Attorney's Office for further review, although no criminal charges appear to have been pursued. *See* IIU Report No. CIR 020600199 is attached as **EXHIBIT 10**.

Hinton remembers that "not long after" Crowder became warden, she "received some complaints when Crowder first became warden about they didn't -- at that time, I thought it was people not understanding his leadership style -- That he might not accept reports on everything because he didn't feel like they rose to -- incidents rose to the level of necessary reporting." Ex. 8, at 47:15-48:3. Hinton would address with Crowder her specific complaints about Green: "When we'd have our meetings, we'd have one on ones, he and I, because, again, he was a new warden and I was mentoring him. I would go down to his office. I would call him down to my office and we'd talk about the complaint that I'd hear." *Id.* at 49:1-10.

Hinton recalls as warden disciplining Singletary for using a weapon without permission. *Id.* at 106:9-15. Hinton describes Singletary as having "blinders on" in overlooking Green's shortcomings and rule violations: "You can call it mother intuition or just years of experience,

---

[12] Now, the Chesapeake Detention Center, a federal pretrial holding center.
[13] In addition to Ms. Hinton, a DPSCS records custodian will testify at trial and confirm this sustained excessive use of force finding against Crowder, absent counsel stipulating as to the authenticity of the underlying investigative documents—which counsel produced to Younger in previous discovery.

there was just something there [between Singletary and Green], and I told them, that, you know, this is not going to end well." *Id.* at 108:6-10, 113:5-9.

Hinton describes MRDCC when she first arrived there in 2006 as "the opposite" of an "elite" institution with "very little discipline." *Id.* at 129:11. She worked hard to change that culture in her time as warden and felt that she achieved some progress over time. *Id.* at 129:12-17.

Hinton remembers investigative captain Peré who, in the spring of 2013 at his first staff meeting at MRDCC, described staff as "liking to put their hands on inmates." *Id.* at 165:9-14. And Hinton testified that she observed that same problem when she became warden of MRDCC in 2006. *Id.* Hinton also remembers Peré raising concerns about Green to Crowder in spring 2013, describing Green's involvement in several uses of force that were "unnecessary," if not excessive." *Id.* at 166:1-6. In fact, Hinton told Peré to "go back and look at one of those uses of force . . . the one that [Green] body slammed the inmate." *Id.* at 166:8-11.

Hinton testified that a warden can reassign an officer within a facility if, for example, "they needed to be kept out of . . . inmate contact whatsoever." *Id.* at 159:16-160:6. Indeed, there were specific "posts that were designated for no inmate contact. The metal detector would be one." *Id.* at 160:4-6. And this reassignment could last thirty days pending an investigation into the officer, which then required findings before that officer could reintegrate to a post "inside the facility." *Id.* at 161:1-7.

When asked if she ever told Crowder to reassign Green to a post with no prisoner contact, Hinton responded: "I shouldn't have to. The warden should know what to do." *Id.* at 169:12-170:3. Anyway, Hinton remembers specifically telling Crowder that Green "was trouble." *Id.* at 170:19-21. And as to Green's supervising commander's (Singletary) knowledge, Hinton was

clear: "I do know . . . that if I moved [Green] off the shift, I've done everything I could possibly do . . . before I got to that point" and "the shift commanders and the lieutenants, the captains, and the majors, they should know the same -- they should have the same information that I have about this particular officer. They should know better. They should know more than I know." *Id.* at 170:9-18.

As Hinton's assistant warden with regular daily contact, meetings, briefings, and access to investigative documents, Crowder knew or should have known that Green was posing a risk during Hinton's tenure as warden, so much so that Hinton felt it necessary to reassign Green to a shift with no direct prisoner contact. And as Hinton's successor, Crowder had actual or constructive knowledge of the facts described above. These facts alone prove Crowder's knowledge that his subordinate officers were engaged in widespread violations that posed a risk of constitutional injury to prisoners at MRDCC.

### *Suzanne Fisher*

Ms. Fisher worked for DPSCS for 42 years before retiring in 2015. Fisher served as Crowder's assistant warden at MRDCC from 2010 until 2013. Fisher Dep., attached as **EXHIBIT 11**, at 11:9-20. Fisher assumed the warden position at MRDCC after Crowder's demotion and discipline in October 2013. *Id.*

Fisher spoke to state investigators several times in October 2013 as part of the internal affairs investigations of the subject attack. During her interview with Detective Carolyn Murray, Fisher described the culture at MRDCC before the attack as one where supervisors did not report incidents within the institution. Ex. 6, at 24:16-19. In Fisher's words: "Well, what I found was when I first went to MRDCC, Ms. Hinton used to be the warden and she was doing – changing

the culture," but then "Hinton left and it just wasn't picked up and then when I came to try to pick it back up, I think people felt that it wasn't from the top down." *Id.* at 32:19-33:5.

Fisher "talked about [this culture change] at roll call, I told them, I said, you know, you're sitting here, talking about what the mission of this Department is, but yet you're not reinforcing the mission. That's to protect the employees, and that's your co-workers. And the offenders under our supervision. I said, you know, you're not doing any of that. So all you're doing is sitting here reciting what you think everybody wants to hear but you don't – you're not doing it." *Id.* at 33:25-34:9. Fisher told officers that if they were doing their jobs properly, they "wouldn't have the complaints." *Id.* at 35:9-14. Fisher described the bad culture that Hinton started to change as one "that's come back. It's changed back, and it will take a while" to change. *Id.* at 36:13-37:4.

Fisher specifically recalled several problematic officers whose "names always appeared in uses of force" and those officers included Green and Ramsey. *Id.* at 24:20-25:2. These "yahoos" were the subject of "discussions" among supervisors, including Crowder, before the attack. *Id.* However, Crowder would shrug off these concerns by saying that these officers were often first responders to tense situations within the institution. *Id.* But Fisher did not accept this explanation, responding to Crowder: "I know, but if you're suspending 'em [sic] for uses of force, then you know you've got an issue. Excessive use of force, when you're suspending people, then you know you have an issue." *Id.* at 25:5-10.[14] Fisher remembered Ramsey

---

[14] This directly contradicts Crowder's assertion, on page 22 of his motion, that Fisher "did not believe" that Green and Ramsey "might deliberately harm an inmate." Moreover, in her State Case testimony, Fisher admitted that she had concerns about staff retaliation against prisoners after the Ganiyu incident, but that her concerns did not include physical violence: "What I -- what kind of retaliation was in my mind was maybe not going to medical on time; messing with their food, not giving them their trays on time; not handling their mail." Fisher Test. (State Case), attached as EXHIBIT 24, at T-230:4-14. Fisher's attempts to revise her previous statements, together with Crowder's outright denial that Fisher's concerns placed him on notice of Green and Ramsey's unconstitutional behavior, squarely places material facts in dispute; *i.e.* whether Crowder knew or should have known that his subordinates were engaged in widespread prisoner abuse at MRDCC.

receiving a suspension for this conduct one year prior to the subject attack. *Id.* at 26:2-8. Green, however, "has always been able to tap dance around some things." *Id.*

When asked if anything was ever done to aggressively address these concerns, Fisher replied "No." *Id.* at 26:2-5. Fisher also recalled that when Hanna arrived at MRDCC in spring 2013, Green "pulled him under his wing" and Hanna's "name started circling with 'em [sic] too." *Id.* at 26:9-18. In fact, Hanna was transferred to MRDCC from another institution because he was "suspected of something but [DPSCS] really couldn't prove it." *Id.* at 26:14-15.

Fisher also reported to IIU Detective Johnathan Wright her concerns regarding Green and Ramsey that began one year prior to the attack: "I had issues with how some of the use of force reports that were written in past incidents," telling Crowder at that time that "the same officer's [sic] names are appearing in the use of force report [sic] and this will be a problem." ECF Nos. 46-2, 60 (IIU Report, CIR 13-35-01334), at 20-21. Those names included Green and Ramsey. *Id.* Fisher told Det. Wright that "she talked to the Warden [Crowder] a year ago about the problem." *Id.* Fisher further recalled that in the spring of 2013, Peré told supervisors, including Crowder, that "we had officers at MRDCC who liked to put their hands on inmates and that we needed to address – well, the warden needed to address it." Ex. 6, at 26:19-22.

Despite his senior staff repeatedly bringing these concerns to his attention, Crowder did nothing to intervene. According to Fisher, "the problem is the communication" between officers, captains, majors, and the supervision. *Id.* at 39:4-20. Fisher concluded that "if we had better communication [before the subject attack], I don't think this would have gotten to where it is." *Id.* at 39:6-8. Fisher reiterated these concerns to Detective Wright on October 25, 2013, who wrote in his final report that Fisher "advised it the communication was better after the Sunday

[Ganiyu] incident that this (Inmates being assaulted) would not have happened." ECF Nos. 46-2, 60 (IIU Report, CIR 13-35-01334), at 21.

Fisher described other supervisory failures before the attack.  For example, when Det. Murray asked Fisher, "Do you get the feeling that . . . How can I say this?  That supervisors may not reveal incidents that may have occurred in the facility, to the administration?"—Fisher answered "Yes." Ex. 6, at 24:16-19.  Fisher described Singletary, who at all relevant times was the shift commander and highest ranking officer overseeing the day shift, as a supervisor who preferred taking matters into his own hands and not reporting incidents up the chain of command.  Fisher told Murray:  "And I had a discussion with him [Singletary] before this incident [subject attack] even happened and said, you know, you don't tell us what's going on. I mean, I'm not sure what's going on here.  And he said he thought he didn't -- because he was the shift commander, if they bumped it up to him and he dealt with it, he didn't need to bump it any higher, and I said that's not true. I said you're not the warden, you're the shift commander." *Id.* at 21:17-25 (emphasis supplied).

Fisher also explained that disciplinary action was "not big down at MRDCC." *Id.* at 37:10-25.  Fisher conceded:  "I mean, it's an embarrassment that five months later I'm giving a letter of counseling, but I've got to give it because we missed the reprimand . . . Nobody gets reprimanded, so why bother." *Id.* at 37:17-38:7.

In an October 4, 2013 memo to Hinton—just four days after the attack—Fisher concluded her rather scathing commentary on the administration of MRDCC, as follows:

> In hindsight, there are several major issues that exist at MRDCC, and as I stated at our meeting, I feel the major one is that the team at MRDCC has lost the confidence of the staff.  As administrators, we all have an 'open door' policy; however, no one felt comfortable to come to any of us about what is really going on in the facility.  It is obvious that no one 'trusts' any of us.

19

I have worked at MRDCC for over three years and it is my opinion that there is no real understanding of how the core functions of this facility impact and overlap albeit whether you oversee or are responsible for the facility, security or program services. The administrators at MRDCC need to be a team and need to reflect this to the staff instead of allowing staff to play one of us against the other. I feel as administrators we failed to ensure the mission of the Department (protecting our employees and offenders under our supervision) was adhered to.

Fisher Memo. to Hinton, (Oct. 4, 2013), attached as **Exhibit 12**, at 5.

### *Raymond Peré*

Raymond Peré, a twenty-five year corrections veteran, was the investigative captain at MRDCC for approximately fourteen months between 2012 and 2013. Peré Dep., attached as **Exhibit 13**, at 12:8-13:4. At MRDCC, Peré was tasked with investigating staff for a variety of wrongdoings, and he reported directly to Crowder. *Id.* at 15:1-15. Peré was inundated with staff investigations almost immediately after arriving at MRDCC, conducting over 170 active investigations of staff misconduct at any given time. Peré Test. (State Case), attached as **Exhibit 14**, at T-222:5-12. Crowder ultimately decided whether to recommend discipline. Ex. 13, at 18:15-19:9.

When Peré arrived at MRDCC in 2012, he told supervisors in his first staff meeting that "your staff is not doing their job. They're not dealing with the inmates' issues, and when you don't deal with the inmates' issues, the inmates act like buttheads and then you have problems, so you need to make sure the staff are doing what they're supposed to be doing." Ex. 9, at 30:18-31:1 (emphasis supplied). Amazingly though, the supervisors "just blew me [Peré] off like I don't know what I'm talking about. This is MRDCC you know." *Id.* at 31:1-2.

Peré approached Crowder in the spring of 2013 with specific concerns about Green and Ramsey's involvement in "unnecessary or avoidable uses of force." Ex. 13, at 29:2-13. Peré gave Crowder specific examples of misconduct, like when Green and others took a mace can and

"sprayed [an] inmate through the [food] slot," when that prisoner was already "in a cell . . . in a secure area." Ex. 9, at 13:1-14:3. Crowder, however, shrugged off Peré's concerns saying "oh, that's a knee jerk reaction." *Id.* at 14:2-3.

Peré testified in the State Case that he noticed "a pattern" with Green and Ramsey's unnecessary and unavoidable uses of force. Ex. 14, at T-185:1-3, T-188:19-24. Peré was a bit more direct with Det. Murray in 2013, describing his conversations with Crowder about Green and others: "they take the opportunity, when it arises, to put their hands on inmates, and I said it may not appear like it's an excessive use of force but when you're dealing with unnecessary uses of force . . . then what the heck." Ex. 9, at 14:11-14, 16:2-25. Peré even described hearing a "special code . . . some kind of funky little squirrely code" that officers, like Green and Ramsey, used over the prison radio system "which means I need my people or some shit, as far as I'm concerned." *Id.* at 9:12-18.

In May 2013, Peré told Crowder "that they needed to be either trained or needed to be some type of intervention with them to discuss the issues with them." Ex. 13, at 36:6-13. In Peré's own words, "a use of force doesn't have to be excessive to be inappropriate." Ex. 14, at T-186:7-11. Peré did not mince words about a "certain group" of MRDCC staff, including Green: "I think they're dealing out their own justice." Ex. 9, at 29:12-23 (emphasis supplied).

At that time, Peré was leaving for vacation, and Crowder said that he and Peré "would look into it after [Peré] got back." Peré Dep. (State Case), attached as **EXHIBIT 15**, at 18:1-13. But when Peré returned from his vacation in May 2013, "nothing was said about it." *Id.* at 18:14-16; Ex. 14, at T-189:16-T-190:6. So Peré took it upon himself to administer impromptu use of force training to Green and a few other officers. Ex. 9, at 17:13-18. Peré told these problematic officers that he was watching them closely: "I said, look, I'm going to tell you

straight up.  I said your uses of force are speculative, you know.  They're suspect.  I said y'all

[sic] need to be [sic] start following the use of force manual or you're going to get hemmed up."

*Id.* at 18:2-9.

Shortly after this encounter, Peré separately called Ramsey into his office and told him

"that he may want to curb his enthusiasm or what have you," meaning that Peré "was keeping an

eye on him and that some of his uses of force were questionable." Ex. 15, at 51:6-15.  However,

Peré confirmed that Ramsey never received any consequences for his pattern of "instances where

maybe he utilized force where other means could have been necessary." Ex. 14, at T-183:22-T-

184:18.

Peré's investigative efforts were often impeded by staff covering for each other, or not

cooperating in the investigation at all: "I mean, you know, when I was doing investigations and I

needed information about another staff member, I could never get any.  As far as I see, obviously

they get along pretty well if they covered for each other, stuff like that." Ex. 15, at 60:1-5.  Peré

testified that he observed incidents prior to the attack where MRDCC officers coerced prisoners

to lie or cover up the fact that they had been assaulted by staff: "I had some instances where I

was investigating uses of force and when I interviewed the inmates, he [sic] inmates would tell

me that they started it, that they threw the first punch at the officer, that they fell out of bed, that

they -- inmates -- if you ever worked in an institution, inmates generally don't take responsibility

for the actions . . . I took it as being odd and I took it as being a sign that there was something

else going on." Ex. 14, at T-186:17-T-187:18.  And after the attack, Peré also told Det. Murray

that MRDCC "staff engaged in actions to cover up things at the institution." *Id.* at T-176:6-13.

Peré testified that any use of force at MRDCC was "put in a logbook in the major's

office." Ex. 13, at 22:9-11.  At the end of every month, Peré transposed these entries and sent

them to Hinton, who reviewed them and discussed her concerns with Crowder.[15]  *Id.* at 22:15.

Peré explained that the use of force logbook's completeness was somewhat arbitrary, however,

because the shift commander determined which incidents would be entered.  *Id.* at 25:17-21.

Notwithstanding this discretion, the documented uses of force in the year preceding the subject

attack revealed a clear pattern that concerned everyone who looked at it, except Crowder.

In fact, during her post-attack investigation, Det. Murray remarked:   "During this

investigation, I requested and received a copy of the Use of Force reports that had occurred at

MRDCC between September 2012 and October 2013.  There were approximately thirteen (13)

Use of Force incidents during that period of time.  Out of those thirteen (13) Use of Force

incidents, one incident did not include Sergeant Ramsey, Sergeant Green, or CO II Hanna."  Ex.

1, at 14.

### *Richard Hanna*

Hanna—one of Younger's assailants—initially denied any involvement in the attack, but

had a change of heart as the reality of a thirteen count criminal indictment set in.  In February

2015, Hanna gave a recorded statement to IIU Detective Johnathan Wright, and confessed to the

subject attack.  *See* Hanna Stmt. to Det. Wright (Feb. 26, 2015), attached as **EXHIBIT 16**.  Hanna

described the culture at MRDCC before the attack as one where staff ignored the rules, vigilante

justice was normal, and where extrajudicial retaliation by officers against prisoners was not only

ubiquitous, but sanctioned or tacitly authorized at the highest levels:  "Females were dating

inmates.  There was always [sic] drugs being brought into the facility.  It was pretty lawless

there."  Hanna Test. (State Case), attached as **EXHIBIT 17**, at T-22:13-17.

---

[15] These monthly summaries have disappeared, despite the State being required by statute to preserve these documents.  DPSCS officials testified in the State Case that they were surprised by the disappearance and had no explanation for same.

For example, Hanna recalled that before the attack, Singletary "would always come and get us . . . when inmates get out of line." Ex. 16, at 50:6-16. Hanna told Det. Wright about an incident where he "watched a lieutenant break -- break his hand on this inmate's face" because "if any inmate back talked a lieutenant, the lieutenant would bring him down to the bullpen and cuff the inmate and beat the crap out of 'em [sic]." *Id.* In that particular incident, the lieutenant "instructed [Hanna] to go get the inmate." *Id.* at 52:3-5.

Hanna also described "something called the goon squad," a "term given to us by the major [Singletary]." *Id.* at 53:16, 54:15-19. This squad of "designated officers" included Ramsey and Green. *Id.* at 54:1-6. Singletary oversaw this hit squad, and directed the squad's extrajudicial activities—"it came from Major Singletary on down." Ex. 17, at T-17:3-9. The goon squad quickly adopted Hanna into its ranks when he arrived at MRDCC in the spring of 2013. *Id.* at T-12:22-T-13:22. Hanna believed he was selected for this service because of his "physical stature" because at that time, he "was 255 pounds" and a "former fighter and body-builder" who "just kind of fell into the role." *Id.* at T-13:17-22. Ramsey explained to Hanna that at MRDCC, "We take care of problems the old school way . . . we handled stuff with our fists, we don't handle stuff with our -- on pen and paper. We don't write tickets." *Id.* at T-16:18-T-17:2.

The goon squad operated on the day shift: "It's like this. On first shift [day shift], it was your bruisers was the guy that was fight back [sic], was your problem solvers who worked outside the lines of duty, I guess you could say. And if you weren't on that, you would have been put on the night shift." *Id.* at T-12:25-T-13:4. Hanna told Det. Wright that once this squad "came on the tier, something was going to happen . . . Like whenever an incident happened, always the same people came to help. Like always the same people took care of it." Ex. 16, at

24

54:4-12. Hanna's description corroborates Peré and Fisher's concerns about the same officers always showing up in uses of force—the concerns that Crowder repeatedly ignored and explained away as "knee jerk reactions." Ex. 13, at 14:2-3.

Hanna was clear that the goon squad's activities were not isolated: "This happens all the time. This [subject attack] is just one that just happened to be recorded and got out. This happens all the time. MRDCC is like they call a fighting jail. Like there's not going to be too many reports written. They're going to pop the cell and the inmates are going to deal with the officers one-on-one. That's how a lot of that stuff gets taken care of at MRDCC." Ex. 16, at 55:14-21. Hanna and his cohorts had no concerns about getting caught: "I wasn't afraid of getting in trouble because it was always taken care of." Ex. 17, at T-17:6-9.

Hanna gave specific examples during his State case testimony: "We beat an inmate in a three-piece [restraint] and then drug him down the stairs. He was unconscious. We don't know what happened to him. He was sent out, 911. His report was written for him. We've left guys in showers for over -- for hours on end." *Id.* at T-17:14-18. Hanna was clear when asked who was present during these prior incidents, "Ramsey, Green, and Singletary." *Id.* at T-19:4-5.

Hanna further testified that Dupree was "how we got the information" about the prisoners that the supervisors wanted the goon squad to target. *Id.* at T-19:8-13. Hanna described that process: "Dupree was our intelligence officer. He got the -- the inmates would talk to him or the female officers would talk to him about a problem with an inmate or situation that would have to be dealt with and he would always give us a list of different inmates that we had to take care of that day." *Id.* at T-19:17-22. Hanna continued: "Well, we would get the list from Lieutenant Dupree. Myself, Sergeant Ramsey, Sergeant Green would carry out these -- the acts of what we had to do and Major Singletary would come and clean it up for us." *Id.* at T-49:1-4.

25

These prisoner victims received different types of punishment: "It all depends on what they were getting taken care of for. Like, we had one inmate. He slapped a female officer's butt, and we ended up -- we broke his jaw and left him in the cell . . . And then we empty a can of mace into it." *Id.* at T-20:1-9. In Hanna's words, this nauseating conduct "was part of the daily job . . . the daily work." *Id.* at T-20:16-17. These incidents, or ordered hits, occurred "twice a week on average" before the subject attack. *Id.* at T-22:4-9. Hanna confirmed that tampering with MRDCC logbooks was commonplace, admitting that he had personally "took pages out of them before" to remove "damning evidence on other officers . . . to protect them." *Id.* at T-43:17-25.

Hanna described the staggering level of complicity by other MRDCC staff in this vigilante conduct. For example, Hanna testified that the squad would bring some prisoner victims to the medical unit after a beating "if it was severe enough . . . but the report would be written for [the prisoner] and they would just sign it." *Id.* at T-20:21-T-21:6. Often times, the nurses "wouldn't write [these incidents] up in the system. They would just treat [the prisoner] and send them right back." *Id.* at T-21:10-15. Hanna testified that Ramsey "would always talk to the medical staff for us. The medical staff knew what was going on." *Id.* at T-21:15-23.

Hanna explained that he and his fellow goon squad members were never disciplined for these acts. In fact, Crowder ensured the squad's protection: "Warden Crowder knew about it. Because he got us out of a lot of trouble. He's the one who sent all the inmates to the different parts of the State when this happened." *Id.* at T-49:5-8. And Hanna believed that he, Green, and Ramsey would get away with the subject attack "because we have gotten away with everything else. Everything else was covered up." *Id.* at T-59:25-T-60:4. Fortunately, even the goon

26

squad's sophisticated cover-up mechanism could not hide their widespread lawless, and sanctioned, conduct within the walls of MRDCC.

Hanna also served as the State's primary witness in the criminal prosecution of Green and Ramsey. Hanna's testimony and recollection of his time at MRDCC has remained the same since his 2015 interview with Det. Wright. Indeed, the State relied on this testimony in securing convictions for Green and Ramsey.

Most notably though—and rather chillingly—Hanna explained to State's counsel how his conscience never impeded his participation in the goon squad until he was caught:

> Q:   And this time, in your direct, you mentioned – in your testimony, you mentioned something about you had done this thing a lot. This time is when you decided your conscience weighed on you?
>
> A:   No, it's the only time that we actually got in trouble for it.
>
> Q:   So you're sitting here today saying that if you didn't get caught, for you, in your head, it would be business as usual?
>
> A:   Yeah, it was business as usual.

Ex. 17, at T-50:5-14.

"Business as usual"—where "arrogant" guards with "relationship[s]" and "baby mama drama" with female shift members, those "yahoos," "take the opportunity, when it arises, to put their hands on inmates" in "unnecessary or avoidable uses of force"—so supervisors tell Crowder and Singletary: "your staff is not doing their job . . . I think they're dealing out their own justice"—But to Crowder, "oh, that's a knee jerk reaction." *Id.*; *see also* Ex. 8, at 24:12, 26:14-19, 101:10-19; Ex. 6, at 24:20-25:2; Ex. 9, at 14:2-14, 16:2-25, 30:18-31:1.

In sum, the Defendants now ask this Court to ignore these material facts. Or, to view each prior notice event in isolation and find that these facts "are insufficient as a matter of law to

support supervisory liability in this case." Crowder Mot. at 23.   The Court should reject these hopelessly absurd arguments, in the same way that the myriad internal affairs investigators did after the subject attack, and leave this determination to the jury.

b. **Crowder's Inadequate Response to His Actual and Constructive Knowledge of Pervasive Constitutional Violations by his Subordinates Shows His Deliberate Indifference or Tacit Authorization of the Offensive Conduct**

Hinton testified that as warden of MRDCC, she noticed a pattern of improper uses of force by Green, "Because we did excessive force reports and there were . . . those that stood out. Those were people who went above and beyond – I won't say above and beyond, because that's making it seem like they did good things, but they exceeded the force that was in our training module."   Ex. 8, at 19:12-20:4.   Hinton recalls identifying Green as "having engaged in excessive force" before 2009, which caused Hinton to conclude that "enough was enough, he had to get off the [day] shift," and she reassigned Green to the overnight shift "where [he] will be less engaged with the inmate population."   *Id.* at 20:7-21, 27:1-4 (emphasis supplied).   Then, as assistant commissioner, Hinton recalls meeting with Crowder "at least weekly" to discuss, *inter alia*, her concerns about Green's problematic tendencies, and even recommending to Crowder that Green be moved off of the day shift. *Id.* at 17:3-20:22.

Hinton demonstrated what a reasonable warden should do when faced with actual knowledge that a subordinate officer is engaged in constitutionally prohibitive conduct—identify the concern, speak to the officer and his supervisors, and intervene when those measures are unsuccessful in curbing the problematic behavior.

Crowder, however, reversed course almost immediately after taking over the position of warden from Hinton, and moved Green from the overnight shift back on to the dayshift. *Id.* at 167:20-168:12.   According to Hinton, "three people could have moved" Green, "The chief, the

assistant warned, or the warden.   And only if they were acting in the warden's capacity.
Ultimately, it's the warden's decision." *Id.* (emphasis supplied).  Crowder's decision to reassign
Green back to the dayshift, after knowing the Hinton had just moved Green to a shift with little
to no prisoner contact, was at a minimum tacit authorization of Green's unconstitutional conduct.

Fast forward to the fall of 2012 when Fisher warned Crowder about several "yahoos"
whose "names always appeared in uses of force," including Green and Ramsey.  Ex. 6, at 24:23-
25.   Crowder shrugged off Fisher's concerns and rationalized that Green and Ramsey only
appeared because they are often first responders.  *Id.* at 25:4-8.  Not accepting this response,
Fisher replied, "yeah, I know, but if you're suspending 'em [sic] for uses of force, then you know
you've got an issue." *Id.*

When Det. Murray asked Fisher:  "Has there ever been -- to your knowledge has there
ever been anything done to aggressively address that issue?  The fact that they're -- ?" *Id.* at
26:2-4.  Fisher responded, "**No**, just I know they got suspended . . . maybe a year ago or
whatever," but "Green has always been able to tap dance around some things." *Id.* at 26:5-8
(emphasis supplied).

Hinton and Fisher clearly recognized, in real-time, a pattern of unconstitutional conduct
with respect to Green and Ramsey.  And Crowder as warden "read each use-of-force report"—
the same reports that caused Hinton and Fisher to be so concerned.  Ex. 3, at 284:24.  Crowder
simply chose to disregard these clear warning signs.

When Peré approached Crowder in the spring of 2013 with additional concerns about
Green and Ramsey's "unnecessary uses of force," Crowder excused that behavior as "knee jerk
reaction[s]" that did not require any intervention.  Ex. 9, at 16:5-20.[16]  To Peré, the appropriate

---

[16] Pere did not even have the benefit of knowing about Green and Ramsey's prior assault charges, the ongoing
criminal assault investigations, or the goon squad's activities, but was still concerned enough to report Green and

course of action in that moment was to move those officers off of the day shift because when "you've got people that are on the use of force all the time . . . they've got to be moved." *Id.* at 17:2-12 (emphasis supplied). Peré was exasperated by the lack of supervisory response: "I don't want to hear everybody's excuses and all that mess because I'd gone around and I'd told . . . all the supervisors . . . [that] your staff is not doing their job." *Id.* at 30:15-25. Crowder, however, did nothing. Ex. 14, at T-205:1-13.

Peré approached Crowder again in early September 2013 with a specific instance of Green's misconduct, for which Peré could not impose a sanction because another officer lied to protect Green.[17] Ex. 9, at 10:16-12:13. Crowder again did nothing, and claims to not remember Peré bringing the September incident to his attention. *See* Ex. 3, at 293:12-25.

Crowder actually testified that he could do "nothing," even after hearing Fisher and Peré's concerns. *Id.* at 254:21-25. Hinton, Fisher, Det. Murray, and the internal affairs investigators all disagree with Crowder's assertion.[18] Amazingly though, Crowder admitted that he could reassign an officer who had not completed the annual in-service training and "put them like in a lobby or at the mezzanine door or somewhere where they didn't have to directly supervise inmates." *Id.* at 226:11-227:8.

The State of Maryland's prison administration expert in the State Case, George Hardinger—a career warden at the Carroll County Detention Center—agreed that Fisher's warnings triggered a duty for the warden to intervene. When asked if an "assistant warden

---

Ramsey's problematic behavior to Crowder. *See* Ex. 14, at T-231:8-19. In fact, out of the tens of thousands of documents associated with this matter, and most held by the State of Maryland, some of the most crucial documents, like Crowder's recorded interview to Det. Sage, the Scrutinized Staff Reports, and the monthly use of force summaries are all gone with no explanation. Except that documents previously "gone" have now materialized— some from counsel (like the exhibits to their motions, as described herein), and some purported to be from Dupree (Younger's correspondence with IGO), which Dupree testified he had never seen.

[17] Perhaps this female officer lied because she was one of Green's "baby mama[s]". Ex. 8, at 26:14-19.
[18] The Seventh Circuit also confirmed that summary judgment for a § 1983 claim is not appropriate when the defendant simply refuses to intervene in any way. *See Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997).

comes to you a year earlier and says there are issues, you would do something, right?;" Hardinger responded, "I would." Hardinger Test. (State Case), attached as **EXHIBIT 18**, at 127:7-12. And when asked if it was reasonable for a warden not to intervene or reassign officers who are actively being investigated for criminal assaults, Hardinger replied, "it's not reasonable to do nothing." *Id.* at 123:7-15.

Younger's prison administration expert also agrees with the IIU conclusions: "In sum, my opinion is that but for Warden Crowder's failure to exercise an acceptable level of correctional supervision over the custody staff, as would be expected by a reasonable correctional administrator, that the assault of Mr. Kevin Younger while in the Maryland Reception, Diagnostics and Classification Center on September 30, 2013, would more likely than not, have not occurred." Report of Donald L. Leach, attached as **EXHIBIT 19**, at 12.

### c. Crowder Did Not Respond Reasonably to the Ganiyu Incident

To make matters worse, Crowder knew by the late morning of September 30, 2013, that at least five prisoners were injured in an attack that morning. *See* Ex. 3, at 247:7-12. In fact, Crowder "admitted knowing that the five inmates referred to as being '*jacked up*' were the five inmates that were alleged to have assaulted Officer Ganiyu on the previous day." Ex. 2, at 4 (alteration in original). Yet, Crowder "acknowledged that he did not take any actions to check on the welfare of the five injured inmates accused of assaulting Officer Ganiyu nor did he instruct any of his staff to do so upon learning that the five inmates had injuries." *Id.* at 4-5. Instead, Crowder waited until approximately 5:30 p.m. on October 1, 2013—36 hours after the attack—to report the incident to IIU. *Id.* at 2.

Had Crowder done anything at all with this knowledge, "the assault [on the prisoners] would have been discovered more than a day before it had been reported to the Internal

Investigative Unit." *Id.* at 5. And it was during this extra day that almost all physical evidence was destroyed, Younger was denied proper medical care, and Younger was falsely accused of and charged with assaulting Ganiyu.

When IIU detectives asked Crowder why he did not speak with or view the prisoner victims "even when he and his staff were actually at the inmates' cells," Crowder "made the comment that *'as long as they're breathing'* which would constitute a check on the inmates." *Id.* at 6 (emphasis supplied). Crowder further acknowledged that he never ordered his staff to check on these prisoners' well-being, and "admitted that attention should have been given to the inmates involved" in the Ganiyu incident. *Id.* This by itself is absolute proof of Crowder's indifference to the health and welfare of the prisoners under his custody, including Younger.

Between the Ganiyu incident and October 1, 2013 when Crowder finally contacted IIU, "routine security rounds" of every housing tier were supposed to occur "every hour by custody staff and twice per shift by supervisory staff." *Id.* During that time, "a total of over 24 rounds should have been conducted by the supervisory staff." *Id.* But "Crowder admitted that he did not inform his staff to provide attention to these inmates." *Id.*

Crowder argues on pages 23-25 of his motion that he responded reasonably to the Ganiyu incident based on the information provided to him at that time. Even if that was true as to Crowder's reaction on September 29th, when Crowder arrived to MRDCC on the morning of September 30, 2013, the Ganiyu incident reports were "incomplete and lacked detail." Ex. 2, at 4. Crowder "stated he was aware of the complete lack of information in the SIR, which he claimed he had discussed with his supervisory staff upon initially reading the SIR the day after the assault on September 30, 2013." *Id.*

However, in the eight days that Crowder remained warden after the Ganiyu incident, "he failed to ensure his staff completed the SIR in a manner that contained all necessary information." *Id.* Indeed, "Crowder admitted that he did not ensure that the SIR was corrected and that he, as Warden, was responsible for the actions of his staff." *Id.* Crowder admitted that no use of force reports were issued for the Ganiyu incident at any point before Crowder was disciplined and left MRDCC on October 7, 2013. Ex. 3, at 276:14-277:5.

Sadly, had Crowder followed up with CO Curry, the officer who responded to the Ganiyu incident, he would have learned that Younger was not involved. Curry witnessed the Ganiyu incident and wrote a report dated September 29, 2013, a copy of which is attached as **EXHIBIT 20**. In his report, Curry states that he "witnessed . . . Ganiyu on the floor with blood on his face while inmate Raymon Lee was standing over him with his right hand balled up trying to punch Ganiyu. At this time I Cpl. Glenn Curry III hand cuffed inmate Raymon Lee and escorted him off the dorm." *Id.* Moreover, the prisoner who actually assaulted Ganiyu provided a written statement to MRDCC supervisors on September 29, 2013, and admitted that he acted alone. *See* Stmt. of Raymon Lee, attached as **EXHIBIT 21**.[19]

Crowder later admitted that it would have "absolutely" been useful to have seen the Curry report when it was prepared. Ex. 3, at 277:22-278:6. Crowder further admitted that someone at MRDCC knew that only one prisoner was actively involved in assaulting Ganiyu. *Id.* at 278:19-21. When asked: "And had you had this piece of communication, that would have made a big difference in your actions as Warden, right?"; Crowder replied: "Absolutely." *Id.* at 278:22-25.

---

[19] Lee's written statement is an exhibit to IIU Report No. 13-35-01347 and, accordingly, is encompassed by the public record exception under FRE 803(8).

So even if Crowder is correct in asserting, on page 24 of his motion, that his subordinates reported the Ganiyu incident to him "incorrectly" on the night of September 29th, Crowder should have learned the actual facts by following up with his staff in the hours and days after that incident. After all, Crowder remained warden of MRDCC for over a week after the Ganiyu incident, until he was placed on administrative leave on October 7, 2013. *Id.* at 299:4-7. Instead, Crowder "simply failed to perform his duties." Ex. 2, at 7.

Crowder justifies his non-action, on pages 8 and 24 of his motion, by stating that he "notified" Hinton on after learning about the Ganiyu incident September 29, 2013, "and she did not give him any additional instructions." However, Hinton has a different recollection. Hinton recalls first receiving a call from Crowder on the evening of October 1, 2013, after Ramsey confessed to the attack. Ex. 8, at 64:16-65:9. After hearing this information, Hinton gave Crowder two orders: "put [Ramsey] into the board room, have him write his report and [] get him union representation," and "make sure that all the inmates got to medical." *Id.* at 67:5-68:12.

On page 9 of his motion, Crowder further contradicts the record, his own testimony, and his admissions to IIU, when he states that he "and his staff did not discover that the Assailants had assaulted Mr. Younger until Tuesday, October 1, 2013." But Crowder admitted during the State Case that he knew about the prisoner attack in the "late morning, mid-morning, somewhere around in there" on September 30, 2013. Ex. 3, at 247:7-13. Crowder's argument also directly contradicts an affidavit that he submitted to this Court in support of his last summary judgment motion: "When I became aware of the assault on the inmates, I called IID to report the incident and commence the investigation." ECF 46-3, at 2. IIU also confirmed Crowder's knowledge of the prisoner attack on September 30, 2013:

34

When questioned about that information, Mr. Crowder acknowledged that he did receive the information in the morning of 9/30/13 as written by Ms. Fisher but denied calling Nurse White in the afternoon to verify the information. Mr. Crowder further admitted knowing that the five inmates referred to as being "jacked up" were the five inmates that were alleged to have assaulted officer Ganiyu the previous day. As a result, Mr. Crowder was questioned as to why he did not inquire as to why the inmates that suffered injuries, most likely due to being assaulted, when he was first made aware and having knowledge that during the previous nights [sic] altercation no injuries were suffered by the inmates. Mr. Crowder stated, "*I didn't know that. From putting all that information together I should have known that, in not doing due diligence you're absolutely right*".

Ex. 2, at 4 (alterations in original).

Regarding Crowder's numerous failures between the Ganiyu incident and October 1, 2013, and based on an extensive investigation and "Crowder's own admission," IIU concluded:

- Mr. Crowder failed to transfer the inmates suspected of assaulting Officer Ganiyu for the safety of both the staff and inmates in a timely manner especially due to the severity of the injuries suffered by the officer.
- Mr. Crowder failed to ensure the proper documentation of both the assault on the officer and the subsequent assault on the inmates. The Serious Incident Report severely lacked the detail and necessary information from the time of the incidents and was still not corrected at the time Mr. Crowder was placed on administrative leave on October 7, 2013.
- Mr. Crowder did not ensure the safety of the five inmates and he failed to instruct staff to check the welfare of the five named inmates in the assault.
- Furthermore, Mr. Crowder and his staff failed to personally view the inmates properly during the segregation review. Both actions resulted in the assault on the inmates not being discovered until two days after the incident.
- Mr. Crowder allowed members of a Security Threat Group, specifically the Black Guerilla Family (BGF), to meet alone and without the presence of any staff. A ranking member of the BGF was allowed to discuss the incident and the potential for retaliation with two of the suspect inmates who are also BGF members potentially creating a security and safety risk.

**Mr. Crowder did not perform his duties as the Warden of MRDCC by either willfully or negligently failing to perform his duties or by performing them in a culpably inefficient manner resulting in a diminished level of safety and security to the inmates, staff, and the institution**. His unwillingness or inability to perform his duties as the warden is unprofessional, and his actions failed to conform to standards, therefore Mr. Crowder failed to properly to discharge the duties of his office.

*Id.* at 7-8 (emphasis supplied).

35

During the State Case, Crowder testified that Detective Sage was "probably lying" in his report. Ex. 3, at 300:8-19. Crowder also disputed Detective Sage's conclusions: "I didn't say all those things at all . . . Those are his facts, those aren't the facts in this case. . . ." *Id.* at 301:24-302:7, 306:22-307:6.

Crowder's admissions and later recantations epitomize genuine disputes of material, indeed dispositive, facts that render summary judgment inappropriate. Crowder will now have the opportunity to cross-examine Detective Sage on these alleged fabrications. A jury must then weigh the evidence and credibility of the witnesses. Summary judgment is thus far from appropriate, and there are sufficient facts to establish Crowder's supervisory liability under § 1983.

Accordingly, Defendants' motions must be denied.

### d.  Binding Precedent Mandates Denial of Defendants' Motions

In *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987), the plaintiff sued individual (§ 1983) and municipal (*Monell* claim) defendants for an excessive force incident during his arrest. *Id.* at 1383-84. A jury found the defendants liable and returned a verdict of $900,000 in compensatory damages. *Id.* at 1385. The municipal defendant appealed, arguing that the evidence of its knowledge and condonation of widespread violations was insufficient to submit the matter to the jury.[20] *Id.* The Fourth Circuit affirmed, finding that the officers of the defendant municipality "were tacitly encouraged to continue self-developed practices of [excessive force and cover-ups] by the deliberate failure of responsible municipal officials to

---

[20] Although *Spell* involved a *Monell* claim, that claim shares the notice element with individual supervisory liability under § 1983, and merely extends, or imputes that notice from an individual supervisor to the greater municipality. *Spell*, 824 F.3d at 1387.

exercise discipline or corrective supervision to halt the widespread, known practices. . . ." *Id.* at 1392.

At trial, the plaintiff relied on evidence "concentrated upon a period of time of three years preceding" the subject assault, including several facts witnesses and internal affairs reports. *Id.* at 1392-94. As to the internal affairs reports, the district court noted "that the instances of confirmed and uncontradicted [sic] misconduct demonstrated in Defendant's own internal affairs documents was devastating to defendant's [sic] case." *Id.* at 1394. The evidence also showed that the police chief—like Crowder—had general authority to establish and implement supervisory policy, and in exercising that authority, "he established a pattern of condonation, cover-up and disregard of reported police misconduct of the specific type charged" in that case. *Id.* The evidence further revealed that the police chief's general authority "was necessarily shared, both in the setting and the implementing of policies and programs, with subordinate officials." *Id.* at 1394-95. The Fourth Circuit found that the evidence was sufficient to support that the plaintiff's injuries were caused by the supervisors' deliberate indifference to, or tacit authorization of their subordinates' known patterns of misconduct. *Id.* at 1395.

Here, Crowder admitted that "warden" is "basically another way of saying the chief executive officer of the institution," who was responsible for implementing "all of" an institution's policies and procedures. Ex. 3, at 207:12-15. The record here, like in *Spell*, includes fact witnesses and documentary evidence that show "specific instances" of misconduct by certain officers, and "that complaints about them were consistently dismissed or disregarded, frequently with but cursory investigation. *Spell*, 824 F.2d at 1394. The only difference between *Spell* and this case is the extension of the individual supervisory liability to a municipal entity.

However, the underlying constitutional violations and the rationale for extending that liability to individual supervisors are identical to Younger's claims.

Accordingly, Younger is entitled to have a jury determine whether Defendants' admitted conduct is sufficient to impose liability.

### e.  Recent Decision Further Supports Denying Defendants' Motions

In *Doe-4 v. Horry County, South Carolina*, No. 4:16-cv-03136-MGL, 2019 WL 1003136 (D. S.C. Feb. 28, 2019), the plaintiff sued several individual and municipal defendants for a sexual misconduct over four months by a police officer, who was indicted for this conduct. *Id.* at *1-2. The defendants included the perpetrator's chief and four of his supervising officers. *Id.* at *2. The supervisory defendants moved for summary judgment, arguing that the allegations "fail[ed] to rise to the level of a violation of" state or federal law, or that they were entitled to sovereign and qualified immunity. *Id.* at *3. The district court denied those motions, finding sufficient evidence to support each of the three *Shaw* prongs for supervisory liability under § 1983. *Id.* at *3-6.

The *Doe-4* court relied on four notice facts to infer that the supervisors knew or should have known of their subordinate officer's misconduct. <u>First</u>, a letter from the perpetrator's father-in-law to police supervisors several years before the assault that raised concerns about the perpetrator's inappropriate interactions with crime victims. *Id.* at *4.[21]

<u>Second</u>, an "in-house, off-the-books investigation" into the perpetrator a few months prior to the assault prompted by another victim's verbal report to the supervising officers. *Id.* The investigation "should have" prompted a "formal investigation," but the supervisors "neglected to report the incident to" internal affairs. *Id.* at *5.

---

[21] Defendants argued that this letter constituted inadmissible hearsay, which the court rejected for the purposes of the summary judgment motion, finding that the letter was "not being offered for the truth of the matter asserted, but instead to demonstrate Defendants' notice of [the perpetrator's] alleged bad conduct." *Id.* at *4.

*Third*, a formal internal affairs report from a few months before the assault in which the perpetrator admitted to inappropriate conduct with a crime victim. *Id.* The chief of police, however, "directed [internal affairs to] close the investigation as unfounded." *Id.* The *Doe-4* plaintiff's expert opined that this evidence alone was "sufficient to put a reasonable supervisory officer on notice" of the offensive conduct. *Id.*

*Fourth*, verbal complaints from the plaintiff's mother to the police department voicing her concerns about the perpetrator's behavior with her daughter during the period in question. *Id.*

The court concluded that a jury presented with this evidence "might well conclude" that the defendant supervisors had actual or constructive knowledge of their subordinate's misconduct because the alleged assault was "not of a single or isolated incident," and that the supervisors' "continued inaction" supported "finding that they either were deliberately indifferent or acquiesced in the constitutionally offensive conduct." *Id.* at *5-6. The court extended basic foreseeability principles to the causation prong, holding that the perpetrator's constitutional violations—despite their criminal nature—"were a natural and foreseeable consequence of Defendants' failure to address his purported pervasive propensities of the misconduct" alleged. *Id.* at *6.

Here, the notice facts begin in 2006 when Hinton became warden of MRDCC, and continue to a few short weeks before the attack when Peré again told Crowder about Green's misconduct. The evidence shows that Hinton, Fisher, and Peré repeatedly warned Crowder about Green and Ramsey, but that Crowder never intervened. Singletary and Dupree had actual knowledge of their subordinates' misconduct because they encouraged that behavior and covered for their officers.

Internal affairs reports corroborate that Crowder never disciplined Green or Ramsey, despite clear warning signs and specific reports from his supervisors.   And after the attack Crowder knew that Younger helped Ganiyu, but failed to intervene.   Any jury presented with these facts can reasonably conclude that the Defendants' "continued inaction in the face of documented widespread abuses" prove that they were "either deliberately indifferent or acquiesced in the constitutionally offensive conduct." *Shaw*, 13 F.3d at 799.

Accordingly, Defendants' motions must be denied.

**f. IIU Reports are Admissible Public Records**

FRE 803(8) states that public records and reports are not excluded by the hearsay rule. Such admissible public reports include a "record or statement of a public office if it sets out the office's activities" about "a matter observed while under a legal duty to report," to include "factual findings from a legally authorized investigation," unless "the source of information or other circumstances indicate a lack of trustworthiness."   Public records have justifiably carried a presumption of reliability, and it should be up to the opponent to "demonstrate why a time-tested and carefully considered presumption is not appropriate." *Ellis v. International Playtex, Inc.*, 745 F.2d 292, 301 (4th Cir. 1984).

The Fourth Circuit explained that "the admissibility of a public record . . . is <u>assumed as a matter of course</u>, unless there are sufficient negative factors to indicate a lack of trustworthiness." *Zeus Enterprises, Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 241 (4th Cir. 1999) (emphasis supplied); *see also Jones v. Ford Motor Co.*, 204 Fed. App'x 280, 284-85 (4th Cir. 2006) (holding NHTSA report and conclusions "fit snugly within" FRE 803(8); *Kennedy v. Joy Technologies, Inc.*, 269 Fed. App'x 302, 308-10 (4th Cir. 2008) (MSHA report and conclusions properly admitted because of "presumptive admissibility created by Rule 803(8)").

The opposing party "bears the burden of establishing its unreliability." *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 301 (4th Cir. 1984). Thus, FRE 803(8) "is not a rule of exclusion, but rather is a rule of admissibility," provided that the proffered report satisfies the requirements of the Rule. *Zeus*, 190 F.3d at 241.

Here, the IIU reports were prepared pursuant to a legal duty. *See, e.g.*, DPSCS Exec. Dir., ADM.050.0052(B)(1) and (C)(7) (requiring IIU to investigate, document, and summarize by report certain acts of employee misconduct); *see also* DPSCS.010.0017.06(A)(1) (""IIU shall investigate"), and (C) ("Incidents required to be Reported to the IIU"), and (E)(3)(e) (**"Preparing an investigative report** that, at a minimum, contains: (i) Complete and detailed information regarding the complaint or incident; (ii) A clear account of investigative actions; and (iii) All relative information supporting the finding.") (emphasis supplied).[22]

In a last-ditch attempt to avoid liability, Defendants preview their intent to exclude the formal IIU reports and conclusions, but neglect to offer any facts even hinting at the reports' unreliability. *See* Crowder Mot., at 16-21 (arguing there is "no admissible evidence" to support Younger's claims). IIU detectives prepared the reports pursuant to a duty imposed by law. The reports document IIU's investigative activities following the subject attack and contain factual findings and conclusions resulting from the statutorily mandated investigation. The State of Maryland relied on these reports in its disciplinary action against Crowder. IIU's factual findings form the basis for this lawsuit and are necessary for Younger to prove the material elements of his claims.

Moreover, the reports are the best and most relevant evidence to prove the elements of Younger's claims. The reports paint the clearest picture of the culture at MRDCC in the years

---

[22] Copies of the cited regulations and directives are attached hereto as **EXHIBIT 22.**

preceding the attack, the attack itself, and the supervisory failures that allowed the attack to

occur. A plain reading of the reports forecloses any argument to the contrary.[23]

Accordingly, the IIU reports and their conclusions are presumptively reliable, especially

given that Defendants have offered no evidence to the contrary. Younger can thus rely on those

reports because their "admissibility . . . is assumed as a matter of course." *Zeus*, 190 F.3d at 241.

## IV.  CROWDER IS NOT ENTITLED TO QUALIFIED IMMUNITY FOR COUNT I (§ 1983)[24]

Qualified immunity shields public officials from liability "as long as their actions could

reasonably have been thought consistent with the rights they are alleged to have violated."

*Tobey v. Jones*, 706 F.3d 379, 385 (4th Cir. 2013). The qualified immunity defense is not

available where the defendant's conduct violated an individual's constitutional rights and those

rights were "clearly established" at the time of the alleged violation. *See, e.g., Harlow v.

Fitzgerald*, 457 U.S. 800, 818 (1982); *Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163 (4th Cir.

2010). Qualified immunity requires a determination as to 1) "whether a constitutional violation

occurred," and 2) "whether the right violated was clearly established." *Tobey*, 706 F.3d at 385.

The Fourth Circuit recently confirmed that reasonable prison officials should understand that

prisoners "have an Eighth Amendment right to be protected from malicious attacks, not just by

other inmates, but also from the very officials tasked with ensuring their security." *Thompson v.

Commonwealth of Virginia*, 878 F.3d 89, 109 (4th Cir. 2017).

Here, Younger "has undoubtedly alleged a violation of his constitutional rights." Mem.

Op., ECF 188, at 24. As this Court previously held: "It is well-established that beating a prison

inmate for purposes other than to restore or maintain prison security or for the prisoner's own

safety violates the prisoner's rights under the Eighth and Fourteenth Amendments to the United

---

[23] Younger does not plan to introduce medical records of any other prisoner, or other protected health information that may be contained in the reports.
[24] Dupree and Singletary offer no qualified immunity arguments in their motions.

States Constitution.  And as this Court recently confirmed in *Jones v. Chapman*, No. ELH-14-2627, 2017 WL 2472220, at *34 (D. Md. June 7, 2017), 'although the burden is on the plaintiff to prove that a constitutional violation occurred, the *defendant must prove* that the right was not clearly established.'" Mem. Op., ECF 72, at 17 (alteration in original) (citation omitted).

On page 26 of his motion, Crowder asserts that Younger "cannot meet either of" the qualified immunity "requirements."  Amazingly, Crowder argues that "the law was not so clearly established that any reasonable official in Mr. Crowder's shoes would have understood that they were violating it." *Id.* (quotation and citation omitted).  Perhaps this explains why Hinton did not think Crowder was qualified to be a warden.  Perhaps this explains why Crowder felt justified in not intervening.  Or, perhaps Crowder misunderstands the rights that he is alleged to have violated.

Younger does not "urge[]," as Crowder suggests on page 26 of his motion, that the only right Crowder violated "is the right to protection from an objectively serious risk that rogue correctional officers would retaliate and deliberately assault inmates."  This Court recently disposed of this enhanced burden argument, concluding that "the law does not impose this requirement—only that the defendant in question is alleged to have been aware of a risk of constitutional injury to citizens *like* the plaintiff." Mem. Op., ECF 188, at 26 (emphasis in original) (quotation and citation omitted).

Younger alleges that Crowder violated several of his basic constitutional rights, including the right to be free from: a) excessive force; b) deprivation of life and liberty without due process; c) known risks of serious physical harm; d) deliberate indifference for a serious medical need; and e) objectively unreasonable conduct that causes, or has the potential to cause, constitutional harm. *See* Am. Compl., ECF 140, ¶ 113.  In essence, Younger asserts two general

categories of Crowder's constitutional violations.   <u>First</u>, Crowder's failures to intervene, as warden, despite his actual and constructive knowledge of his subordinates' unconstitutional conduct.   <u>Second</u>, Crowder's personal acts that violated Younger's rights.   Crowder simply ignores these allegations, and the mountain of evidence supporting them.

Crowder further argues on page 27 of his motion, that "the law did not give" him "fair warning that his conduct was unconstitutional," and that "it was not sufficiently clear" to Crowder that his acts and failures "violated Mr. Younger's Eighth and Fourteenth Amendment rights under the circumstances of this case."   In support, Crowder states that "none of the supervisory MRDCC officials deposed in this case . . . thought the Assailants might commit a premeditated retaliatory assault on inmates."   *Id.*

The record, however, tells a different story.   Anyway, Crowder's myopic focus on the period of time between the Ganiyu incident and the subject attack misunderstands the nature of the constitutional allegations against him.   Stated somewhat differently, even if every former MRDCC supervisor agreed that officer retaliation was not a concern after the Ganiyu incident—which they do not—Crowder's numerous and repeated failures in the seven years before the attack, and in the seven days that followed, preclude a qualified immunity defense.

Accordingly, Defendants motions must be denied.

## V.   YOUNGER PROPERLY EXHAUSTED HIS ADMINISTRATIVE REMEDIES BECAUSE IIU'S INVOLVEMENT RENDERED THOSE REMEDIES UNAVAILABLE[25]

At least three important reasons prevent Defendants from prevailing on a failure to exhaust defense.   <u>First</u>, IIU's involvement in this matter stripped IGO's jurisdiction, thus making the administrative remedy process unavailable to Younger.   The Supreme Court confirmed this in 2016, and this Court has repeatedly found a prisoner's administrative remedies unavailable as

---

[25] Dupree offers the failure to exhaust argument on behalf of all moving defendants. ECF 186-1, at 3-16.

a matter of law when IIU becomes involved.  <u>Second</u>, various prison administrators, including

Crowder, thwarted Younger's ability to pursue an administrative remedy by repeatedly telling

Younger that his claims were fully preserved.  Notwithstanding these representations, Younger

still filed an administrative grievance within the required period.  But Younger was then

wrongfully charged and convicted for the Ganiyu incident, transferred from MRDCC, and had

his personal property confiscated and never returned to him, including his initial grievance

paperwork.  <u>Third</u>, as with their pretrial versus convicted prisoner argument, Defendants again

offer—for the first time—individuals and documents that were never disclosed or produced to

Younger.[26]  Specifically, Defendants offer two newly-identified witnesses, and over 100 pages of

new documents in support of their arguments.[27]  Younger is severely prejudiced by Defendants'

eleventh hour disclosure because he could not conduct discovery on these matters.  For these

reasons, Defendant's exhaustion argument must fail.[28]

### a.  IIU Investigation Rendered Administrative Remedies Unavailable to Younger

Maryland requires prisoners to exhaust claims for excessive force through a three-step

administrative procedure, as described on pages 5 to 7 of Dupree's motion.

---

[26] The Declarations offered in support of Defendants' pretrial versus convicted prisoner status and administrative exhaustion arguments should also trigger FRCP 56(h).

[27] Included in these documents from Dupree—which Dupree testified he had never seen before—was correspondence from Younger to various state agencies about the attack, his assailants, and his lack of access to medical care.  The documents are all dated within one year of the subject attack.  Clearly, these documents were in the possession of the State of Maryland, not Dupree.  Problematically, counsel for the State not only never produced these to Younger and even stipulated to their non-existence, but also raised a notice defense in the State Case, arguing that Younger had failed to notify the State of his injuries within one year of the attack.  That notice defense was the subject of two motions to dismiss, a motion for reconsideration, a motion for judgment, and a motion for judgment notwithstanding the verdict.  For these documents to now appear for the first time from an individual defendant who has never seen them is further proof that Defendants, and their counsel, are engaged in a sophisticated game of hide-the-ball in an effort to prejudice Younger and his ability to seek redress.  Simply put, this conduct cannot be explained as a mere oversight.

[28] Younger incorporates his Opposition to Renewed Motion to Dismiss, State Case, Paper No. 8/1, attached as **EXHIBIT 23**, as if fully set forth herein.

In *Ross v. Blake*, 136 S. Ct. 1850 (2016), the United States Supreme Court concluded that a prisoner must only exhaust "available" remedies that "are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (quotation and citation omitted). The Court identified three circumstances in which a remedy may be unavailable:  1) if it operates as a simple "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; 2) if the administrative scheme is "so confusing" or "opaque that it becomes, practically speaking, incapable of use"; or 3) if prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

*Ross* indirectly affirmed the prior decisions of several judges in this district that an IIU investigation "shuts down the ARP process and thus exhausts administrative remedies" when the grievance is subject to ARP jurisdiction. *Brightwell v. Hershberger*, No. DKC-11-3278, 206 WL 4537766, at *9 (D. Md. Aug. 31, 2016).[29]  Since *Ross*, judges in this district have likewise found that prisoners do not have an available administrative remedy to exhaust where there was a pending IIU investigation. *See, e.g., Oakes v. Dep't of Public Safety*, No. GLR-14-2002, 2016 WL 6822470, at *4-5 (D. Md. Nov. 18, 2016); *Brightwell*, 2016 WL 4537766, at *7-9; *Carmichael v. Buss*, No. TDC-14-3037, 2017 WL 2537225, at *5 (D. Md. June 9, 2017).  Judge Chasanow recently confirmed that "claims for excessive force fall within ARP jurisdiction." *Oakes*, 2016 WL 6822470, at *4 n.2 (citing COMAR 12.07.01.01B(8)).

---

[29] *See Kitchen v. Ickes*, 116 F.Supp.3d at 625 ("The court is aware that once a claim of excessive force is referred to IIU[,] no further administrative remedy proceedings may occur."); *see also Shiheed v. Shaffer*, No. GLR-14-1351, 2015 WL 4984505, at *3 (D. Md. Aug. 18, 2015); *Manzur v. Daney*, No. PWG-14-2268, 2015 WL 1962182, at *3 (D. Md. Apr. 29, 2015); *Chew v. Green*, No. DKC-13-2115, 2014 WL 4384259, at *13 (D. Md. Sept. 2, 2014); *Henderson v. Simpkins*, No. CCB-13-1421, 2014 WL 3698878, at *6 (D. Md. July 24, 2014); *Bogues v. McAlpine*, No. CCB-11-463, 2011 WL 5974634, at *4 (D. Md. Nov. 28, 2011); *Williams v. Shearin*, No. L-10-1479, 2010 WL 5137820, at *2 n.2 (D. Md. Dec. 10, 2010); *Thomas v. Bell*, No. AW-08-2156, 2010 WL 2779308, at *4 (D. Md. July 7, 2010).

These decisions all point to a DPSCS regulation—which Dupree attached as exhibit 2 to his motion— that mandates dismissal of a prisoner grievance if it shares the "same basis" as an IIU investigation.  ECF 186-3, at 65 (DCD 185-003.VI.N.4) (providing that warden "shall issue a final dismissal").  In fact, this mandatory dismissal must state:  "Since this case shall be investigated by IIU, no further action shall be taken within the ARP process."  *Id.* (emphasis supplied).  Here, Younger did not have an available administrative remedy to exhaust because his grievance would have been subject to the ARP process absent the IIU investigation.

Defendants' argument on pages 11 and 12 of Dupree's motion regarding another prisoner victim's successful pursuit of his administrative remedy for injuries caused by the subject attack is similarly unavailing.  This Court recently rejected this exact argument: "To the extent that the IGO has considered the merits of appeals of ARPs filed when there was a parallel IIU investigation, they appear directly to contradict the policy as stated in the DCD.  The Supreme Court labeled this anomaly 'perplexing in relation to normal appellate procedure' and exposes the absurdity of this approach."  *Carmichael*, 2017 WL 2537225, at *5 (emphasis supplied).  And in *Brightwell*, this Court also rejected this argument as "disingenuous" and offending basic "common sense."  *Brightwell*, 2016 WL 4537766, at *9.  In sum, Younger "met his burden to exhaust upon the initiation of that [IIU] investigation."  *Id.*

Troublingly, Defendants' counsel has repeatedly recognized the point Younger presses here—that IIU's involvement "supercede[s] [sic] an ARP investigation."  Mem. at 3-4, Dkt. No. 14-1, *Wilkerson v. Farmer*, No. 06-cv-575 (D. Md. July 14, 2006); *see also* Mem. Ex. 5, Dkt. No. 13-5, *Bacon v. Merchant*, No. 07-cv-2033 (D. Md. Feb. 27, 2008); Memo. Ex. 8, Dkt. No. 33-12, *Gladhill v. Shearin*, No. 08-cv-3331 (D. Md. Aug. 19, 2010); Mem. Ex. 7, Dkt. No. 31-7,

*Wagner v. Galley*, No. 06-cv-1130 (D. Md. Dec. 1, 2006); Mem. Ex. 5, Dkt. No. 12, *Green v. Sacchet*, No. 02-1835 (D. Md. Aug. 30, 2002).[30]

Younger repeatedly testified that he filed numerous grievances within the required time period, but "never heard back" because he was transferred from MRDCC to another institution to serve his 120 days in solitary confinement for the erroneous charges from the Ganiyu incident. *See* ECF 186-5, at 4 (157:5-158:13). Younger saved his grievances from MRDCC, but DPSCS staff confiscated his personal property when he was transferred to serve his punishment. *See* Ex. 7, at 51:16-25. So when IGO asked Younger for copies of his previously-filed ARPs, he could not produce them, but only because DPSCS staff confiscated those documents, not because Younger failed to follow the administrative procedure. Indeed, to now suggest that Younger should have participated in an admittedly unavailable process is exactly the type of "game-playing" that "thwarts the effective invocation of the administrative process." *Ross*, 136 S. Ct. at 1862.

Finally, on pages 14 to 16 of Dupree's motion, Defendants attribute to this Court findings that it never made. Defendants cite *Mitchell v. Williams*, No. WMN-14-1781, 2016 WL 3753726 (D. Md. July 7, 2016), as a "virtually identical fact pattern as here." However, the plaintiff in *Mitchell* "failed to respond to Defendants' motion" and did "not refute the evidence" of his alleged failure to exhaust. *Id.* at *4. Had the *Mitchell* plaintiff responded, the Court would have been compelled to find his claims to have been properly exhausted because of IIU's involvement.

Accordingly, Younger properly exhausted his administrative remedies because those remedies were unavailable to him as a matter of law, and Defendants' motions must be denied.

---

[30] Ironic is too gentle of a word to describe Defendants, through their counsel, arguing that judicial estoppel bars Younger's claims.

## CONCLUSION

For these reasons, summary judgment is not appropriate on any count, and Defendants'

motions must be denied.

Respectfully submitted,

_____

David Daneman, #06976, CPF #8912180145
Allen E. Honick, #19822, CPF #1612130266
**WHITEFORD, TAYLOR & PRESTON, L.L.P.**
Seven St. Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
(410) 347-8700
ddaneman@wtplaw.com
ahonick@wtplaw.com
*Counsel for Plaintiff,*
*Kevin Younger*

*10295872*

49

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 2nd day of December, 2019, a copy of the foregoing *Plaintiff's Combined Opposition to Defendant Crowder, Dupree, and Singletary's Motions for Summary Judgment and Request for Hearing* was sent via the Court's electronic case management system to all counsel of record, and *forwarded (with Exhibits 3, 4, 7, 8, 11, 13, 14, 15, 17, 18, 23 and 24 only)* via first class mail, postage paid, to the *pro se* defendants, as described below:

**Robert A. Scott, #24613**
**Justin E. Fine, #18731**
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202
(410) 576-7055 – Office
(410) 576-6955 - Facsimile
rscott@oag.state.md.us
jfine@oag.state.md.us
*Attorneys for Defendant,*
  *Tyrone Crowder*

**Ann D. Ware, #23785**
Assistant Attorney General
200 St. Paul Place, 17th Floor
Baltimore, Maryland 21202
(410) 576-6562 – Office
(410) 576-6437 - Facsimile
aware@oag.state.md.us
*Attorney for Defendant,*
  *Wallace Singletary*

**Karl A. Pothier, #23568**
**Shelly E. Mintz, #00960**
Assistant Attorney General
120 W. Fayette Street, 5th Floor
Baltimore, Maryland 21201
(410) 230-3138 – Pothier Phone
(410) 230-3135 – Mintz Phone
karl.pothier@maryland.gov
shelly.mintz@maryland.gov
*Attorney for Defendant,*
  *Neil Dupree*

**Jemiah Green**
10303 Sunny Lake Place
Apt. B
Cockeysville, Maryland 21030
*Pro Se Defendant*

**Richard N. Hanna**
1641 Poole Road
Darlington, Maryland 21034
*Pro Se Defendant*

**Kwasi H. Ramsey**
4 Trestlewood Court
Randallstown, MD 21034
*Pro Se Defendant*

_____
        Allen E. Honick, #19822, CPF #1612130266